1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JACK KENNETH BARRON,

11              Petitioner,                    No. CIV S-03-0842 MCE DAD P

12        vs.

13   DERRAL G. ADAMS, et al.,

14              Respondents.                   FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

18   entered against him on April 14, 2000, in the Sacramento County Superior Court on three counts

19   of first degree murder with a multiple-murder special circumstance.  He seeks relief on the

20   grounds that: (1) the trial court erred in admitting into evidence an undelivered letter from

21   petitioner's wife (Irene Barron) to petitioner; (2) the evidence was insufficient to support the

22   court's finding of premeditation and deliberation with respect to Count 1 (murder of Irene

23   Barron); (3) the evidence was insufficient to support his conviction on Count 2 (murder of

24   petitioner's son, Jeremy Barron); and (4) the evidence was insufficient to support his conviction

25   on Count 4 (murder of petitioner's mother, Roberta Butler).  Upon careful consideration of the

26   /////

                                              1

record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL BACKGROUND

After a court trial in the Sacramento County Superior Court, petitioner was found guilty of three counts of first degree murder with a multiple-murder special circumstance. On April 14, 2000, petitioner was sentenced to three consecutive terms of life in prison without the possibility of parole. The California Court of Appeal for the Third Appellate District affirmed petitioner's conviction and sentence on February 11, 2002. Petitioner's petition for review was denied by the California Supreme Court on May 15, 2002.

Petitioner filed a petition for a writ of habeas corpus in this court on April 23, 2003. By order dated April 29, 2003, that petition was dismissed for failure to name the proper respondent. On May 23, 2003, petitioner filed an amended petition. On August 21, 2003, respondents filed a motion to dismiss the amended petition for failure to exhaust state court remedies with respect to one of the claims contained therein. By order dated January 22, 2004, respondents' motion to dismiss was granted and petitioner was given leave to file a second amended petition containing only exhausted claims.

Petitioner filed a second amended petition on January 12, 2004. By order dated February 25, 2004, that petition was stayed while petitioner exhausted his additional claim in state court. On January 3, 2005, after completing state exhaustion proceedings, petitioner filed a third amended petition containing all of his claims.

FACTUAL BACKGROUND[1]

> In a bench trial, defendant Jack Kenneth Barron was convicted of murdering his wife Irene in 1992, his son Jeremy in 1993, and his mother Roberta Butler in 1995; defendant was acquitted of murdering his daughter Ashley in 1994.

---

[1] The following summary is drawn from the February 13, 2002 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-9, lodged in this court on August 4, 2005, as lodged Document 4.

2

* * *

The question as to each death was whether it resulted from criminal activity on defendant's part or a naturally occurring condition. At this juncture, we will provide a background on each death. We will set forth additional facts in our subsequent discussion of the issues.

In 1992, defendant lived in Sacramento with his 34-year-old wife Irene, and their two children, Jeremy, 3, and Ashley, 2.

**Irene's Death**

Between 7:00 and 8:00 a.m. on June 8, 1992, Irene was discovered dead on her waterbed by a neighbor Jeremy had let in. Irene was lying on her back sideways across the bed with her legs hung over the bed frame. A pillow covered Irene's face. The pillow had black streaks on it consistent with the black mascara Irene was wearing on her eyelashes.

A forensic pathologist, Gregory Schmunk, determined that Irene had died before 2:00 a.m. on June 8, and likely a few hours before that. Because Irene still wore makeup, it was likely she was killed before she retired for the evening.

Dr. Schmunk's autopsy of Irene disclosed several small hemorrhages (known at petechial hemorrhages and Tardieu spots) consistent with suffocation, strangulation or significant pressure on the chest. Irene also had a large bruise on her inner right biceps, another on the back of her right calf, and a few small bruises on her right foot; all of these apparently were incurred within 12 hours of her death.

Dr. Schmunk could not determine the cause of death. He could not exclude suffocation, but he did not see the customary significant signs of traumatic adult asphyxia. Killing Irene on a waterbed, though, may have reduced those signs. In the days preceding her death, Irene had also experienced severe headaches and some slurring of speech and unsteadiness of gait; the autopsy disclosed she had a benign growth on her pineal gland, which could have caused these symptoms. Schmunk factored in these symptoms in arriving at his conclusion of undetermined cause, but later learned that this type of growth would not have contributed to Irene's death.

On June 7, 1992, defendant had arrived for his grocery store night shift job at the normal time of 11:30 p.m. Starla H., a friend of defendant who also worked the night shift, noticed that defendant looked pale and upset upon arrival. Defendant told Starla that Irene had been having bad headaches, and he would have stayed

home with her had she not insisted he work because they needed the money.

**Jeremy's Death**

Jeremy died on February 7, 1993.  He was four years old.  On that day, Jennifer Johnson, as usual, arrived at defendant's house a little before 1:00 p.m. to baby-sit Jeremy and Ashley so defendant could sleep before starting his night shift at work.  Uncharacteristically, though, no one answered the door for Johnson when she arrived despite her repeated knocking.  Johnson went home, about 10 minutes away, and phoned defendant.  Defendant answered and said he must have been in the shower when Johnson was at the door.

Defendant then had Johnson return to watch the children.  Johnson and defendant peeked into the children's rooms, and both children appeared to be asleep as they usually were when Johnson arrived to baby-sit.  Defendant noted that Jeremy was not feeling well and that he had given Jeremy some cough medicine.  Defendant then stated he was going to bed.

When Johnson went to Jeremy's room a couple of hours later, she could not rouse him.  The boy was dead.  The boy's body and his bedcovers were in the same position as when Johnson had glanced in his room upon arrival.  Jeremy had no rigor or lividity (meaning he had not been dead for more than a few hours).

Dr. Schmunk, who had performed Irene's autopsy, also performed Jeremy's.  Schmunk could not determine what caused Jeremy's death, but could not exclude suffocation or a heart or brain condition causing sudden death.  The only significant finding was a petechial hemorrhage in one eye; this was consistent, though, with a CPR effort performed on Jeremy or with suffocation.  It is well known in forensic pathology that a child can be suffocated (smothered) without leaving much, if any, evidence.

**Ashley's Death**

Ashley was the next to die, also at four years of age.  It happened on August 6, 1994.  That day, defendant's mother, Roberta Butler, and her cohabitant, Timothy O'Keefe, returned Ashley to defendant at approximately 8:30 p.m., after having had her for about two to three weeks.  Ashley appeared healthy at this point.  Defendant, however, seemed irritated.

Jill Pressley, a baby-sitter who had worked in the health care field for 20 years, arrived on August 6 a little after 10:15 p.m. to watch Ashley.  Defendant said that Ashley was asleep, and that he had just checked on her.  Defendant then left for work.

Shortly before midnight, Pressley glanced into Ashley's room. Ashley appeared fine, and was on her side.   Pressley at some point then fell asleep.  When she awoke, around 4:00 a.m., she discovered Ashley lying dead on her back, her body "very stiff."

Gregory Reiber, a forensic pathologist in the same medical group as Schmunk, performed Ashley's autopsy.  Before concluding his report, he reviewed Irene's and Jeremy's autopsies.  Reiber was satisfied with Jeremy's findings, but had always been a little troubled with Irene's.

Reiber could not determine what caused Ashley's death, but specifically noted that homicidal violence could not be excluded.

After Jeremy's death, Ashley had been examined to see whether she had a genetic heart defect or sleeping difficulties that could cause sudden death.  Ashley's heart and sleeping patterns appeared normal, although she possibly had a slightly elevated QTc interval. In rough terms, the QTc interval measures how long it takes for the heart to return, after one beat, to the electrical condition necessary for the next beat.  Prolonged QTc Syndrome (or Long QTc Syndrome) is a rare and generally hereditary form of heart disease that can disrupt the normal heart rhythm and possibly lead to sudden death.

An electrocardiogram (EKG) is used to measure the QTc interval. This measurement, however, is not an exact science.  The upper limit of normal for a child's QTc interval is .44 (representing 440 milliseconds).  One pediatric cardiologist measured Ashley between .38 and .44.  A second pediatric cardiologist measured her at .44.  And a third measured her at .46 and .47.

Irene's mother, Norma Paget, had QTc intervals measured between .424 and .47.  But since Norma was 72 years old, it would be "very, very unusual" if she had the disease.  Ashley showed no symptoms of the disease.  Neither did Irene or Jeremy.  However, a fatal episode of cardiac arrest may be the first (and last) sign of the disorder.

A slightly elevated QTc interval (above .44 and below .48) means the person should be examined further to eliminate the possibility of the rare disease.  A QTc interval above .48 is of greater concern, and one exceeding .60 is essentially diagnostic of the disease.

In light of her upper-normal to slightly elevated readings, Ashley's doctors recommended that Ashley be monitored with a 24-hour EKG known as a Holter monitor.  Defendant never complied with this recommendation, although he was asked to do so several times.

/////

5

**Roberta Butler's Death**

The fourth and final familial death surrounding defendant was that of his mother, Roberta Butler, on February 27, 1995.

During that month, defendant was residing with his mother in Benicia while he completed his training (probationary) period as an assistant conductor for Amtrak.

Carol Moreno, a friend of Butler's who lived in Montana, visited and stayed with Butler during the week before her death. Moreno left the Saturday prior to Butler's death on Monday. That week, the relationship between defendant and Butler was "extremely tense." Defendant's conduct toward Butler was surly, belligerent, critical and nasty. Butler was fed up with defendant's spendthrift and insolent ways. She thought defendant might be spending the life insurance proceeds from Ashley's death (a few thousand dollars) on a married woman; she was going to confront him on Monday (February 27), and if he was spending the money, she was going to boot him out of the house.

At 2:21 p.m. on February 27, emergency personnel, responding to a 911 call from defendant, found Butler dead lying diagonally across her bed face up. When leaving work at 10:15 p.m. on Sunday, February 26, Butler appeared upbeat and made no complaints about her health. Defendant told the police that when his mother returned home from work on that Sunday about 10:20 p.m., she told him she was stressed out, had a headache, and felt out of shape. Defendant said he left for work at 4:50 a.m., and returned at 2:17 p.m. to find his mother not breathing. Butler was 52 years old, and in good health; she was 5 feet 3 inches tall and weighed 145 pounds.

A forensic pathologist, Brian Peterson, performed an autopsy on Butler. Peterson concluded that Butler had been smothered to death.

Peterson reviewed the autopsy reports on defendant's other family members. He believed that Irene's physical findings were consistent with an asphyxial suffocation similar to Butler's. He agreed that the causes of Jeremy's and Ashley's deaths could not be determined.

When Gregory Reiber, the forensic pathologist who had performed Ashley's autopsy, learned of Butler's autopsy, he reexamined Irene's and Jeremy's deaths; Dr. Schmunk, who had performed the autopsies on Irene and Jeremy, suggested this be done as well. (Schmunk had left Reiber's medical group by this point.) Reiber agreed with Dr. Schmunk's conclusion that the cause of Jeremy's death could not be determined. But Reiber disagreed regarding Irene. Reiber noted that the photographs from Irene's autopsy had

6

never been printed; and prints showed greater bruising and traumatic injuries than was evident from the negatives.  In an addendum to Irene's autopsy report, Reiber concluded she died of "probable traumatic asphyxia."  This meant chest and/or neck compression, and suffocation.  Two other pathologists in Reiber's medical group agreed with his conclusion.

Defendant testified and denied killing these four family members.

A cardiologist who treats adults, Steven Correa, testified for the defense.  He measured Ashley's QTc interval, finding its longest point to be .51 and its average at .482.  Based on this evidence, and the circumstances of Ashley's death and the deaths of her mother and brother, Dr. Correa opined "that in the absence of any other obvious cause of death, sudden cardiac death due to familial LQTS[] [Long QT Syndrome] is the etiology of these deaths."  The fact that Irene's mother, Norma Paget, had an elevated QTc interval further supported his opinion.  Dr. Correa did not view Butler's death as relevant to his opinion because he "was looking at [the deaths] with the question of familial causes."

ANALYSIS

I. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues <u>de novo</u>.  <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

/////

7

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

II.  Petitioner's Claims

A.  Improper Admission of Evidence

Petitioner claims that the trial court erred in admitting into evidence an undelivered letter from Irene Barron to petitioner.  He argues that the letter was "hearsay from a non-testifying witness."  (Third Amended Petition (hereinafter Pet.) at consecutive p. 6.)  Petitioner also alleges that his trial attorney failed to "properly and aggressively argue the admission of letter as well of prosecutor's character and behavior of his tactics."  (Id.)  On

1   appeal, petitioner argued that the admission of Irene's letter into evidence at his trial violated

2   state evidentiary rules and petitioner's "Sixth and Fourteenth Amendment rights to confrontation

3   and cross-examination of witnesses." ("Appellant's Opening Brief" (hereinafter AOB), lodged

4   on August 4, 2005 as lodged Document 1, at 47.)

5        1. <u>Background and State Court Decision</u>

6        The California Court of Appeal fairly described the background to petitioner's

7   claims regarding the admission of the letter as follows:

8        Defendant contends the trial court erred prejudicially in admitting
    into evidence an undated letter from Irene to defendant. The
9        prosecutor argued the letter showed that defendant had a motive to
    kill Irene and was a Dr. Jekyll and Mr. Hyde. We find no error,
10       given the limited purpose for which the letter was admitted.

11       Defendant never received the letter. It was found among Irene's
    personal effects by her mother. The letter reads:
12

13       "Jack,

14       "I am really sorry your [sic] unhappy right now. I have a hard time
    beleiving [sic] the only reason for this is my unability [sic] to keep
15       the house exactly the way you like it. You obviously don't want to
    talk to me about it and that really scares me. We have always had
16       the kind of relationship where we could talk and be open with each
    other. I don't understand this sudden change in you.

17       "We usually have so much fun together. We have so much to be
    happy & thankful for. Two great kids, a home, family & friends
18       and what I thought was a very strong love for each other. My
    feelings for you have not changed but since you won't open up to
19       me I really don't know where your head or heart is at.

20       "It really upsets me when I hear you talk about divorce. I can't
    believe [sic] you are really serious about that. If you are, then you
21       have had me and everyone fooled for a long time. Things have
    been so good for for [sic] us for so long. You don't [sic] just wake
22       up one day and suddenly decide something like that.

23       "If your [sic] upset about something else like work, I can
    understand that. I know how hard its [sic] been on you lately. I
24       would really like to be able to help. But if what you said to me this
    morning is all that is upsetting you then I'm sorry and I will try to
25       do better. I only ask that you take into account and realize that I
    have a stressful job too and sometimes I can use your support &
26       understanding too.

"Please talk to me and lets [sic] resolve this and get back to the way we used to be together.

"I really do love you so very much and the kids & I need you.

"All my love

"Irene"

In a pretrial motion, defendant moved to exclude the letter as inadmissible hearsay.

Struggling to articulate a theory of admissibility, the prosecution posited a non-hearsay purpose.  The mere fact that Irene had to write a letter to defendant, rather than speak directly to him regarding marital issues, tended to show marital discord.

In a carefully reasoned ruling, the trial court rejected the prosecution's argument and excluded the letter.  The trial court concluded that the "proffered evidence does not by reasonable inference tend to prove the disputed fact [of marital discord].  The inference to be drawn is necessarily conjectural and speculative in nature."

At trial, defendant testified on direct examination about his relationship with Irene.  Defendant said that he and Irene had had only two minor disagreements during their marriage; that they never had arguments because they always discussed and talked about things; that their relationship was an "every-day, loving" one; and that divorce had never been mentioned by either of them.

On cross-examination, the prosecutor sought to counter this testimony.  He began to ask defendant preliminary questions about identifying Irene's letter.  The following exchange immediately ensured:

"MR. ROMERO [Defense counsel]:  Objection, your Honor, I think the letter was previously excluded by the Court after a hearing.

"THE COURT:  I'll sustain the objection.

"MR. O'MARA [Prosecutor]:  Your Honor, when he makes the statement that he never discussed the divorce with his wife and here we have a letter where she says –

"THE COURT:  Counsel, let me take a look at the letter.  Thank you.  [¶]  [{B}rief pause.]  [¶]

/////

10

1    "THE COURT:  Thank you.  It appear[s] to me appropriate cross-
     examination with regard to his previous statement about only two
2    arguments.  [¶]  You may continue."

3    The prosecutor then had defendant read the following sentences
     from the letter (as transcribed):  "It really upsets me when I hear
4    you talk about divorce" (without being asked, and without
     objection, defendant read the whole paragraph that started with this
5    sentence); and, "I'm really sorry you're unhappy right now.  I have
     a hard time believing that the only reason for this is my unability
6    [sic] to keep the house exactly as you . . . like it."

7    Without objection, the prosecutor in his closing argument read the
     letter in its entirety.  Also without objection, the prosecutor argued
8    that the letter showed that defendant was unhappy with Irene and
     wanted a divorce – which provided a homicide motive – and
9    further that defendant was "the old Dr. Jekyl[l] and Mr. Hyde."

10   (Opinion at 9-12.)

11          The state appellate court determined that the letter was properly admitted pursuant

12   to the "state of mind hearsay exception" contained in the California Evidence Code "to show

13   Irene's state of mind regarding the marriage to impeach defendant's testimony on the subject."

14   (Id. at 12.)  The appellate court conceded that in his closing argument, the prosecutor attempted

15   to use the letter to show "motive and [petitioner's] Dr. Jekyll and Mr. Hyde nature," but

16   concluded that "the trial court had properly admitted the letter for the limited purpose of

17   impeachment and, in this bench trial, knew how to properly consider the letter in this limited

18   way."  (Id. at 14.)  The appellate court also found nothing in the record that showed Irene had a

19   motive to fabricate in the letter or that the letter was untrustworthy in any way.  (Id.)

20          With regard to petitioner's federal challenges to the admission of the letter, the

21   California Court of Appeal ruled as follows:

22          Defendant makes the related argument that the admission of Irene's
            letter violated his federal confrontation right and therefore his right
23          to due process of law.  Defendant did not raise these contentions in
            the trial court, and has therefore waived them.  (footnote omitted).
24          In any event, our analysis on the proper, limited admission of the
            letter dispenses with any confrontation and due process concerns.
25          Since the letter was admitted under the well-recognized state of
            mind exception to the hearsay rule, the federal confrontation clause
26          permits its admission. (footnote omitted.)

11

1      The trial court did not err in admitting Irene's letter to show her
       state of mind to impeach defendant's testimony concerning the
2      health of their marriage.

3   (Id. at 14-15.)

4          2. Due Process

5          Petitioner's claim that the trial court violated California law in admitting Irene's

6   letter into evidence does not state a cognizable claim in this court. As explained above, a federal

7   writ of habeas corpus is not available for alleged error in the interpretation or application of state

8   law. Middleton, 768 F.2d at 1085. Absent some federal constitutional violation, a violation of

9   state law does not provide a basis for habeas relief. Estelle, 502 U.S. at 67-68. Accordingly, a

10  state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it

11  renders the state proceedings so fundamentally unfair as to violate due process. Drayden v.

12  White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir.

13  1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

14         For the reasons explained by the California Court of Appeal, the admission into

15  evidence of Irene's undelivered letter to petitioner did not render his trial fundamentally unfair.

16  The letter was relevant for the purpose of impeaching petitioner's testimony regarding the health

17  of his marriage. The trial judge, as the trier of fact, was capable of properly evaluating the letter

18  for that limited purpose. The state court's decision rejecting petitioner's due process claim is not

19  contrary to or an unreasonable application of federal law and should not be set aside.[2]

20  /////

21  /////

22

23        [2] Respondents contend that during a discussion between the trial judge and counsel at the
    end of petitioner's trial, petitioner "consented to the admission of the letter at trial, without
24  restriction as to purpose." (Answer at 31.) However, a review of the record does not corroborate
    respondents' assertion in this regard. (See Reporter's Transcript on Appeal (RT) at 5272-79.)
25  Rather, it appears that Irene's letter was admitted into evidence for the limited purpose of
    impeaching petitioner's trial testimony, as explained by the California Court of Appeal, and that
26  the trial judge considered the letter for that purpose.

3.  Confrontation Clause

Petitioner also claims that the admission of Irene's letter at his trial violated his right to confront the witnesses against him.  Respondents argue that petitioner's Confrontation Clause claim is unexhausted.  (Answer at 24.)  Specifically, respondents argue that "the Confrontation Clause claim was not fairly presented to the California Supreme Court, because the procedural context of that presentation was not one under which that Court normally would consider the merits of the claim."  (Id. at 30.)  In this regard, respondents contend that because petitioner did not object to the introduction of the letter at trial on Confrontation Clause grounds, relief could not be granted on such grounds on appeal.  (Id.)  Thus, respondents reason, "the Confrontation Clause claim is not exhausted on a theory of fair presentation to the California Supreme Court."  (Id.)

Even if petitioner failed to exhaust his Confrontation Clause claim in state court, this court will recommend that the claim be rejected on the merits.  See 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").  A federal court considering a habeas petition may reject an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable."  Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).  Petitioner's claim in this regard is not "colorable" and relief should therefore be denied.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ."  U.S. Const. amend. VI.  This right, extended to the States by the Fourteenth Amendment, includes the right to cross-examine witnesses.  Cruz v. New York, 481 U.S. 186, 189 (1987) (citing Pointer v. Texas, 380 U.S. 400, 404 (1965)).  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  Lilly v. Virginia, 527 U.S. 116, 124 (1999) (quoting Maryland v. Craig, 497 U.S. 836, 845

1   (1990)).  See also Davis v Alaska, 415 U.S. 308, 315 (1974) (a primary interest secured by the

2   Confrontation Clause is the right of cross-examination).  However, an unavailable witness's out-

3   of-court statement may be admitted against a criminal defendant and not run afoul of the

4   Confrontation Clause so long as it bears adequate indicia of reliability – i.e., falls within a

5   "firmly rooted hearsay exception" or otherwise bears "particularized guarantees of

6   trustworthiness" such that adversarial testing would be expected to add little, if anything, to the

7   statement's reliability.  Ohio v. Roberts, 448 U.S. 56, 66 (1980); Lilly, 527 U.S. at 124-25.

8   Whether a statement bears "particularized guarantees of trustworthiness" must be shown from

9   the totality of the circumstances surrounding the making of the statement, not from the trial

10  evidence as a whole.  Idaho v. Wright, 497 U.S. 805, 819 (1990).  Petitioner's Confrontation

11  Clause claim is governed by these standards.[3]  See Winzer v. Hall, 494 F.3d 1192, 1196-98 (9th

12  Cir. 2007) (applying these standards); Bolton v. Knowles, No. 05-15966, 2007 WL 793200, *1

13  (9th Cir. Mar. 15, 2007) (concluding that where habeas petitioner's direct review became final

14  prior to the decision in Crawford, his Confrontation Clause claim was governed by the standards

15  /////

16  /////

17

18      [3]  In 2004, the United States Supreme Court held that the Confrontation Clause bars the
    state from introducing into evidence out-of-court statements which are testimonial in nature
19  unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the
    witness, regardless of whether such statements are deemed reliable.  Crawford v. Washington,
20  541 U.S. 36 (2004).  However, for purposes of the AEDPA, this court must look to federal law as
    it existed at the time of the state court decision in determining whether federal habeas relief
21  should be granted.  Williams, 529 U.S. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.
    2003).  The holding in Crawford is not retroactive to cases on collateral review.  Whorton v.
22  Bockting, ___ U.S. ___, 127 S. Ct. 1173, 1184 (2007).  Therefore, the decision in Crawford does
    not apply because it was decided after petitioner's trial and appeal.  Winzer, 494 F.3d at 1194.  In
23  any event, Irene's letter was not testimonial in nature because it was not created "under
    circumstances which would lead an objective witness reasonably to believe that [it] would be
24  available for use at a later trial."  Crawford, 541 U.S. at 52.  See also Parle v. Runnels, 387 F.3d
    1030, 1037 (9th Cir. 2004); Leavitt v. Arave, 383 F.3d 809, 830 n.22 (9th Cir. 2004).  Therefore,
25  it would not be subject to the Confrontation Clause.  See Davis v. Washington, 547 U.S. 813,
    821 (2006) ("It is the testimonial character of the statement that separates it from other hearsay
26  that, while subject to traditional limitations upon hearsay evidence, is not subject to the
    Confrontation Clause").

1  set forth in <u>Ohio v. Roberts</u>); <u>Wayne v. Felker</u>, No. Civ S-03-2437 RRB DAD P, 2007 WL

2  3054099, *6-7 (E.D. Cal. Oct. 19, 2007).[4]

3              As explained above, the state appellate court determined that Irene's letter was

4  admissible under the "state of mind hearsay exception of Evidence Code section 1250, to show

5  Irene's state of mind regarding the marriage to impeach defendant's testimony on the subject."

6  (Opinion at 12.)  Where a petitioner alleges a Confrontation Clause violation, a federal habeas

7  court must independently analyze whether a state court determination that the challenged

8  statements fall or do not fall within a firmly rooted exception to the hearsay rule have a factual

9  basis in the record.  <u>Winzer</u>, 494 F.3d at 1199 ("in sum, even under AEDPA, we cannot avoid the

10  question of whether a hearsay statement falls within a firmly rooted exception to hearsay and so

11  complies with the Confrontation Clause").  Accordingly, this court must independently analyze

12  the record to determine whether a sufficient factual basis supports the state court's conclusion

13  that Irene's letter was evidence of her state of mind and therefore not subject to exclusion under

14  the hearsay rule.  <u>Id.</u> at 1199-1201.

15              California Evidence Code § 1250 provides, in relevant part, as follows:

16      (a) Subject to Section 1252, evidence of a statement of the
         declarant's then existing state of mind, emotion, or physical
17      sensation (including a statement of intent, plan, motive, design,
         mental feeling, pain, or bodily health) is not made inadmissible by
18      the hearsay rule when:

19      (1) The evidence is offered to prove the declarant's state of mind,
         emotion, or physical sensation at that time or at any other time
20      when it is itself an issue in the action.

21  Irene's letter was evidence of her state of mind regarding the problems in her marriage, which

22  was relevant to rebut petitioner's trial testimony that, in his opinion, the marriage was virtually

23  problem-free.  As noted by the California Court of Appeal,

24  /////

25  _____

26      [4]  Citation of this unpublished disposition by the Ninth Circuit Court of Appeals is
     appropriate pursuant to Fed. R. App. P. 32.1 and U.S. Ct. of App. 9th Cir. Rule 36-3(b).

> [petitioner] testified that he and Irene "never ever had arguments because [they] always discussed and talked about things," that their relationship was an "every-day, loving" one, and that divorce had never been mentioned.  Those portions of Irene's letter showing her state of mind that disputed this characterization of the marriage were admissible to impeach [petitioner's] testimony in this regard.

(Opinion at 13.)

Here, the state appellate court's determination that Irene's letter came within the hearsay exception created by California Evidence Code § 1250 is supported by a factual basis in the state court record.  The letter was an attempt by Irene to put her thoughts into writing shortly after an argument with petitioner.  Her thoughts about problems in their marriage were relevant to rebut petitioner's testimony on the same subject.  Under these circumstances, the letter was admissible under the "state of mind" hearsay exception.  See United States v. Faust, 850 F.2d 575, 585 (9th Cir. 1988) (in order to determine admissibility under federal hearsay exception for the declarant's "state of mind," a court must examine three factors: contemporaneousness, chance for reflection, and relevance); United States v. Pheaster, 544 F.2d 353, 376 (9th Cir. 1976) ("under the state of mind exception, hearsay evidence is admissible if it bears on the state of mind of the declarant and if that state of mind is an issue in the case"); People v. Smithey, 20 Cal. 4th 936, 971-72 (1999).  Cf. People v. Coleman, 38 Cal. 3d 69, 81 (1985) (trial court committed reversible error by admitting into evidence and permitting quotation from three highly emotional and inflammatory letters written by defendant's wife, for the purpose of impeaching the defendant's credibility, because the wife's state of mind was not at issue in the case and the risk that the letters would be considered by the jury for improper and prejudicial purposes far outweighed any probative value attributable to them).

Because the record establishes both that the declarant (Irene) was unavailable and that her statements fell within a firmly-rooted hearsay exception, there was no constitutional violation resulting from the admission of the letter into evidence at petitioner's trial.  See Terrovona v. Kincheloe, 852 F.2d 424, 427 (9th Cir. 1988) (finding no Confrontation Clause

1   violation where declarant's statement was within "firmly-rooted" state-of-mind exception); see
2   also Horton v. Allen, 370 F.3d 75, 85 (1st Cir. 2004) (concluding that state-of-mind exception to
3   the hearsay rule is "firmly rooted " exception, so that admission of nontestimonial statements
4   within that exception would not violate Confrontation Clause); Moore v. Reynolds, 153 F.3d
5   1086, 1107 (10th Cir. 1998) (holding in a federal habeas action brought by an Oklahoma capital
6   defendant that Oklahoma's state of mind exception to the hearsay rule satisfies the reliability
7   requirement of Ohio v. Roberts).

8           Even if the "state of mind" exception were not to be considered a "firmly rooted
9   hearsay exception," the letter in question bore sufficient indicia of reliability to satisfy Sixth
10  Amendment requirements.  As noted by the state appellate court, Irene's letter "carries the
11  probability of trustworthiness" because it was drafted "in a natural manner and not under
12  circumstances of suspicion."  (Opinion at 14.)  Accordingly, the state court did not violate
13  petitioner's right to confrontation when it admitted Irene's letter into evidence at his trial.

14          Even if the trial court erred in admitting Irene's letter into evidence, this court
15  concludes that any error was harmless.  Confrontation Clause violations are subject to harmless
16  error analysis.  Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).  On collateral review, an
17  error is not "harmless" if it "had substantial and injurious effect or influence in determining the
18  jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  In determining whether an
19  error is harmless, the question is "what effect the error had or reasonably may be taken to have
20  had upon the [fact-finder's] decision.'"  Wade v. Calderon, 29 F.3d 1312, 1322 (9th Cir. 1994)
21  (quoting Brecht, 507 U.S. at 642-43 (Stevens, J., concurring)), overruled on other grounds by
22  Rohan ex rel. Gates v. Woodford, 334 F.3d 803, 815 (9th Cir. 2003).  An error is not harmless if
23  a reviewing court is "in grave doubt" as to whether the error had "substantial and injurious effect
24  or influence."  O'Neal v. McAninch, 513 U.S. 432, 435 (1995).

25          The California Court of Appeal determined that any error in admitting Irene's
26  letter was essentially harmless because "the trial court had properly admitted the letter for the

1  limited purpose of impeachment and, in this bench trial, knew how to properly consider the letter

2  in this limited way." (Opinion at 14.)  The state courts' decision in this regard is not objectively

3  unreasonable and should not be set aside.  The letter was relevant to rebut petitioner's testimony

4  about the state of his marriage and there is no evidence the trial judge considered it for any other

5  purpose.  In addition and as discussed in more detail below, there was other evidence introduced

6  at petitioner's trial which indicated that petitioner was dissatisfied with his marriage, that he did

7  not want to get involved in divorce proceedings and that he discussed the possibility of murder

8  with several people.  (RT at 3398-99, 3554, 3567, 4114-15, 4127, 4437-38.)  Under these

9  circumstances, additional evidence that petitioner and Irene were having marital problems was

10  merely cumulative in any event.  Accordingly, any error in admitting the letter into evidence at

11  petitioner's trial was harmless.

12  4. <u>Ineffective Assistance of Trial Counsel</u>

13  Petitioner also claims that his trial attorney failed to "properly and aggressively

14  argue the admission of letter as well of prosecutor's character and behavior of his tactics." (Pet.

15  at consecutive p. 6.)  The California Court of Appeal did not address a claim of ineffective

16  assistance of trial counsel in its opinion on appeal.[5]

17  Respondents argue that any claim of ineffective assistance of counsel is

18  unexhausted because it was improperly raised for the first time in "the reply brief [petitioner]

19  filed in the California Court of Appeal." (Answer at 30.)  Respondents assert that "the

20  presentation of a claim for the first time in a reply brief is a procedural context in which the

21  merits of the claim normally will not be considered." (<u>Id.</u>)  However, even assuming arguendo

22  /////

23  ———————————

24  [5] In his opening brief on appeal, petitioner claimed that to the extent his trial counsel did
    not preserve a hearsay objection to Irene's letter at trial, he rendered ineffective assistance.

25  (AOB at 57-58.)  In his reply brief, petitioner claimed that to the extent his trial counsel did not
    preserve an objection under the Confrontation Clause to admission of the letter, he rendered

26  ineffective assistance. ("Appellant's Reply Brief," lodged on August 4, 2005 as lodged
    document 3, at 6.)

18

1  that petitioner failed to exhaust his ineffective assistance of counsel claim in state court, this

2  court will recommend that it be rejected on the merits.  See 28 U.S.C. § 2254(b)(2).

3          The Sixth Amendment guarantees the effective assistance of counsel.  To support

4  a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the

5  circumstances, counsel's performance fell below an objective standard of reasonableness.

6  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  After a petitioner identifies the acts or

7  omissions that are alleged not to have been the result of reasonable professional judgment, the

8  court must determine whether, in light of all the circumstances, the identified acts or omissions

9  were outside the wide range of professionally competent assistance.  Id. at 690; Wiggins v.

10  Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of counsel claim "[t]here

11  is a strong presumption that counsel's performance falls within the 'wide range of professional

12  assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S.

13  at 689).  There is in addition a strong presumption that counsel "exercised acceptable

14  professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702

15  (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

16          Second, a petitioner must establish that he was prejudiced by counsel's deficient

17  performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

18  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

19  been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

20  confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

21  F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

22  performance was deficient before examining the prejudice suffered by the defendant as a result of

23  the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

24  lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949,

25  955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

26  /////

1       A review of the state court record reflects that, contrary to his claim, petitioner's

2  trial counsel vigorously argued against the introduction of Irene's letter into evidence.  Defense

3  counsel in fact succeeded in having the letter excluded from evidence until petitioner testified in

4  a manner that was flatly contradictory to Irene's statements in the letter.  Moreover, even if

5  counsel's performance with respect to the letter was somehow deficient, petitioner has failed to

6  demonstrate prejudice.  As discussed above, the admission into evidence of Irene's letter was

7  harmless under the circumstances of this case.  Counsel's failure to prevent the letter from being

8  admitted does not undermine confidence in the result of this trial.

9       Finally, petitioner's claim that his trial counsel rendered ineffective assistance

10  because he failed to challenge the prosecutor's "character" and "behavior" is vague and

11  conclusory and should be rejected on that basis.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir.

12  1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not

13  warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).

14       For the foregoing reasons, petitioner is not entitled to relief on his claim that his

15  trial counsel rendered ineffective assistance in connection with the admission into evidence of

16  Irene's letter.

17       B.  Sufficiency of the Evidence

18       Petitioner raises several claims based upon the alleged insufficiency of the

19  evidence.  Specifically, he claims that (1) the evidence was insufficient to support the court's

20  finding of premeditation and deliberation with regard to Count 1, the murder of Irene Barron; (2)

21  the evidence was insufficient to support his conviction on Count 2, the murder of Jeremy Barron;

22  and (3) the evidence was insufficient to support his conviction on Count 4, the murder of Roberta

23  Butler.  The court will analyze these claims in turn below.

24       1.  Legal Standards

25       The Due Process Clause of the Fourteenth Amendment "protects the accused

26  against conviction except upon proof beyond a reasonable doubt of every fact necessary to

1    constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There

2    is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

3    favorable to the prosecution, any rational trier of fact could have found the essential elements of

4    the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also

5    Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988).  "[T]he dispositive question under

6    Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a

7    reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443

8    U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when

9    challenging the sufficiency of the evidence used to obtain a state conviction on federal due

10   process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).  In order

11   to grant the writ, the federal habeas court must find that the decision of the state court reflected

12   an objectively unreasonable application of Jackson and Winship to the facts of the case.  Id.

13          The court must review the entire record when the sufficiency of the evidence is

14   challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

15   vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

16   the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

17   reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.  If the trier of

18   fact could draw conflicting inferences from the evidence, the court in its review will assign the

19   inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The

20   relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

21   the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th

22   Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a

23   reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors

24   reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court

25   determines sufficiency of the evidence in reference to the substantive elements of the criminal

26   offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

2. <u>Irene Barron</u>

Petitioner claims that there was insufficient evidence of premeditation and deliberation introduced at his trial to support his conviction on the charge of first-degree murder in the death of Irene Barron.  The California Court of Appeal rejected this argument, reasoning as follows:

> In the months before and after Irene's death in June 1992, evidence showed that defendant was dissatisfied with his marriage.
>
> Defendant and his coworker, Starla H., had become friends who confided in one another regarding their marriages.  In early 1992, Starla and her husband were thinking of separating, and Starla mentioned this to defendant.  At that point, defendant encouraged Starla to work on her marriage.  Defendant added that his marriage was strained as well, because he and Irene were unable to spend enough time together.
>
> In March 1992, defendant told his longtime friend, David Bednarczyk, that he and Irene had been having some problems, but that it was not a big deal.
>
> Also in early 1992, there was evidence that defendant had sexually "come on" to another female coworker.  After Irene's death, defendant unsuccessfully sought the coworker's company for a weekend trip to Lake Tahoe.
>
> Finally, on the issue of dissatisfaction, there was Irene's letter; the letter was admitted to impeach defendant's rose-colored testimony characterizing the nature of his marriage by showing Irene's state of mind on the subject.
>
> There was also evidence that divorce was not an option for defendant.  He had told Starla H. that he would never seek one, having seen what Irene had gone through with hers.  A friend of defendant's, Clifton Call, had discussed with defendant on several occasions in 1989 Call's particularly nasty divorce.  These discussions apparently left quite an impression on defendant.  He told Call that, rather than endure such tribulation, he would instead "do away" with his spouse.  Call added that defendant's tone was not a joking one.  Defendant made a remark in a similar vein – after Irene's death – to his coworker, Stuart Tuscher, after Tuscher stated he did not believe his former wife was properly using child support payments.  Tuscher was shocked by the remark and its eager, confident delivery.
>
> A month or two after Irene's death, Starla H., now separated from her husband, moved in with defendant along with her children, and

1   then engaged in a sexual relationship with defendant.  It was
    defendant who had suggested the move.

2

3   Based on all of this evidence, a trier of fact reasonably could infer a
    motive to kill Irene.  (footnote omitted.)

4   Furthermore, substantial evidence showed that defendant had
    suffocated Irene.  As the Attorney General notes, this manner of

5   killing evidenced a certain deliberative aspect, involving, as it did,
    the suffocation of a young, good-sized adult (Irene was 34 years

6   old, nearly 5 feet 10 inches tall, and weighed 190 pounds).  This is
    because it would have taken at least 30 seconds of lethal force to

7   subdue Irene's struggles.  Even if the suffocation had begun as an
    impulsive act, the trier of fact reasonably could conclude that it

8   ended as a considered one.

9   We conclude the evidence is sufficient to support a finding of
    premeditation and deliberation regarding Irene's death.

10

11  (Opinion at 16-18.)

12          Viewing the evidence in the light most favorable to the verdict, and for the

13  reasons described by the California Court of Appeal, the undersigned concludes that there was

14  sufficient evidence from which a rational trier of fact could have found beyond a reasonable

15  doubt that petitioner was guilty of the premeditated murder of Irene Barron.  In California,

16  premeditation and deliberation can be established through three basic categories of evidence:

17  evidence of planning activity, evidence of defendant's motive, or evidence about the manner of

18  killing.  People v. Boyd, 43 Cal. 3d 333, 347-48 (1987);  People v. Anderson, 70 Cal. 2d 15, 26-

19  27 (1968);  People v. Gunder, 151 Cal. App. 4th 412, 420 (2007) (noting that the factors

20  recognized in Anderson are but a guide for appellate courts and not an exhaustive list that

21  excludes all other types and combinations of evidence that could support a finding of

22  premeditation).  In the instant case, as the state appellate court pointed out, there was sufficient

23  evidence presented at petitioner's trial from which a reasonable trier of fact could infer that

24  petitioner had a motive to kill Irene and that he thought about committing the crime beforehand,

25  or at least at some point during the actual killing.

26  /////

23

1          Petitioner asserts that "authorities who arrived at scene of appellant's wife (Irene)

2   death, on June '92, saw <u>NO</u> evidence of a struggle or an un-natural death" and that the

3   pathologist "saw <u>NO</u> evidence of trauma." (Pet. at consecutive p. 7.)  However, as related above,

4   Dr. Schmunk's autopsy of Irene contained several findings that were consistent with suffocation

5   or a struggle, although the doctor ultimately could not determine the cause of her death.

6   Although Dr. Schmunk did not see "the customary significant signs of traumatic adult asphyxia,"

7   it was also noted that the fact that the killing was carried out on a waterbed might have reduced

8   those signs.  In any event, even if petitioner's assertion that there was no immediate evidence of a

9   struggle or a strangulation is true, by the time of trial there was other compelling circumstantial

10  evidence indicating that Irene's death was brought about by premeditated murder.  In light of that

11  circumstantial evidence, a reasonable finder of fact could conclude that the killing of Irene was

12  premeditated and deliberate, as that term is defined by state law.

13         The state appellate court opinion rejecting petitioner's claim in this regard is a

14  reasonable construction of the evidence in this case and is not contrary to or an objectively

15  unreasonable application of federal law.  <u>See</u> <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002); <u>see</u>

16  <u>also</u> 28 U.S.C. § 2254(d)(1).  Accordingly, petitioner is not entitled to habeas relief on this claim.

17              3.  <u>Jeremy Barron</u>

18         Petitioner also claims that the evidence introduced at his trial was insufficient to

19  support his conviction on Count 2, the murder of Jeremy Barron.  He asserts that Jeremy's death

20  was caused by the same genetic disorder ("Long Q.T. syndrome") that caused the death of Irene

21  and Ashley Barron.  (Pet. at consecutive p. 7.)  In the traverse, petitioner states that Jeremy had

22  "a bad cold and was on over-the-counter medication, medication that could trigger Long Q-T

23  heart episode" at the time of his death.  (Traverse at 3.)

24         The California Court of Appeal rejected petitioner's argument in this regard,

25  reasoning as follows:

26  /////

Although the cause of Jeremy's death could not be determined, suffocation could not be excluded.  One of Jeremy's eyes displayed a petechial hemorrhage.  This finding is consistent with suffocation, but also with the CPR effort performed on Jeremy.  It is a cardinal rule of forensic pathology that a young child may be smothered or suffocated without leaving much, if any, evidence.  There was no direct evidence that Jeremy had a long QTc interval.  The chance that he died of that syndrome was statistically slim.

Defendant had threatened to kill Jeremy, and more than once had stated that it was better that Jeremy had died.  Although defendant denied making these statements or claimed they were misunderstandings, credible sources insisted they had heard them as genuine remarks.  Defendant was also perturbed when Jeremy's death was revealed to law enforcement personnel at the scene of Butler's death.

The circumstances surrounding baby-sitter Jennifer Johnson's arrival on the day of Jeremy's death were unusual and possibly suspicious regarding defendant.  Uncharacteristically, no one answered the door for Johnson, despite her repeated knocking.  Defendant did eventually have Johnson baby-sit that day, and the two of them peeked into the children's rooms upon her arrival.  Defendant made a point of telling Johnson that Jeremy was not feeling well and that he had given Jeremy some medicine; nevertheless, defendant reminded Johnson to awaken Jeremy at the normal time so the boy would not sleep too long.  A couple of hours later, Johnson had to uncharacteristically rouse Jeremy, only to discover that he was dead and that his body was in the same position it had been in when she glanced into his room upon arriving.  Jeremy had been dead only a few hours.

Finally, strong evidence showed that defendant had suffocated his wife and his mother.  This "other crimes" evidence could be used to show defendant's motive, intent, plan, or knowledge regarding his son's death.[6]

We conclude the evidence is sufficient to support a finding that Jeremy died as a result of criminal agency rather than natural causes.

(Opinion at 18-20.)

Viewing the evidence in the light most favorable to the verdict as this court must,

and for the reasons described by the California Court of Appeal, the undersigned concludes that

---

[6] Evidence Code section 1101, subdivision (b).

there was sufficient evidence from which a rational trier of fact could have found beyond a

reasonable doubt that petitioner was guilty of the murder of Jeremy Barron.  Although the

evidence that Jeremy's death was caused by a homicide was not overwhelming, the state

appellate court opinion rejecting petitioner's insufficiency of the evidence argument was a

reasonable construction of the evidence in this case and was not contrary to or an objectively

unreasonable application of federal law.  Accordingly, petitioner is not entitled to habeas relief

on this claim.

           4.  <u>Roberta Butler</u>

        Petitioner claims that the evidence introduced at his trial was insufficient to

support his conviction on Count 4, the murder of his mother, Roberta Butler.  His claim in this

regard is stated in its entirety as follows:

> Roberta Butler passed away in Feb. '95.  Even though Roberta
> Butler was <u>NOT</u> connected genetically to the others, the lack of
> physical evidence of any kind of physical struggle, and the <u>biased</u>
> findings of Dr. Peterson, pathologist at autopsy.  <u>Biased</u> that he
> knew of the other deaths, <u>before</u> the autopsy.  If Roberta Butler was
> being attack (sic), evidence would show signs of a struggle.

(Pet. at consecutive p. 7.)  This argument advanced by petitioner was rejected by the California

Supreme Court on December 15, 2004, with citations to <u>In re Waltreus</u>, 62 Cal. 2d 218 (1965)

and <u>In re Lindley</u>, 29 Cal. 2d 709 (1947).  (Docket No. 36.)

        Respondents argue that this claim of insufficient evidence is unexhausted.

(Answer at 42-45.)  Notwithstanding the exhaustion requirement, this court will recommend that

petitioner's claim be denied on the merits pursuant to 28 U.S.C. § 2254(b)(2).

        Viewing the evidence in the light most favorable to the verdict, the undersigned

concludes that there was sufficient evidence from which a rational trier of fact could have found

beyond a reasonable doubt that petitioner was guilty of the murder of Roberta Butler.  The

evidence that Butler's death was caused by a homicide was overwhelming.  There was evidence

that petitioner and his mother were not getting along and that Butler intended to confront

1  petitioner about his spending habits on the day of her death.  Further, the forensic pathologist

2  who performed the autopsy on Butler concluded that she had been smothered to death.  As noted

3  by respondents, petitioner does not argue that someone else killed his mother; rather, he argues

4  that she was not murdered at all.  The evidence does not support petitioner's argument in this

5  regard.  Further, contrary to petitioner's claim, there is no evidence that the pathologist who

6  performed Butler's autopsy was biased against petitioner.

7            The decision of the California Supreme Court rejecting petitioner's claim that the

8  evidence was insufficient to support his conviction of the murder of Roberta Butler was a

9  reasonable construction of the evidence in this case and was not contrary to or an objectively

10  unreasonable application of federal law.  Accordingly, petitioner is not entitled to habeas relief

11  on this claim.

12                                    CONCLUSION

13            For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

14  application for a writ of habeas corpus be denied.

15            These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

17  days after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20  shall be served and filed within ten days after service of the objections.  The parties are advised

21  that failure to file objections within the specified time may waive the right to appeal the District

22  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23  DATED: June 2, 2008.

24

25

                                        _____
26  DAD:8
    barron842.hc                         DALE A. DROZD
                                         UNITED STATES MAGISTRATE JUDGE

                                        27